JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>TRANSACT, INC.<br><br>TRANSACT, INC. et al.<br><br>               Plaintiff(s),<br><br>     vs.<br><br>FRANK D'ERRICO, et al.<br><br>              Defendant(s). | CASE NO. SACV 13-1312-MWF<br><br>(Consolidated with SACV 13-1512-MWF)<br><br>**ORDER AFFIRMING IN PART, REVERSING IN PART, AND REMANDING JUDGMENT AND ORDER** |

The underlying bankruptcy proceeding is *In re Transact, Inc.*, No. 8:07-bk-11443-ES (the Honorable Erithe A. Smith, United States Bankruptcy Judge). These appeals arise from a related adversary action, No. 8:08-ap-01001-ES, that was tried in the bankruptcy court (the Honorable Scott C. Clarkson, United States Bankruptcy Judge).  The adversary action involved a dispute about unfinished residential construction on a lot in Corona del Mar.  Plaintiffs Transact, Inc. ("Transact") and its principal, Allan Reumont, sued Defendants and Cross-Defendants Frank D'Errico, RHFD Pebble, Inc. ("RHFD"), the D'Errico Living Trust, and other

1

1  Defendants not parties to the appeals.  Certain Defendants brought cross-claims
2  against Plaintiffs.

3          After a bench trial on all of the claims and cross-claims of the adversary
4  action, the trial court entered its Memorandum of Decision ("MOD") on August 7,
5  2013.  (Joint Appendix ("JA") Ex. 5).  Judgment was entered that same day.  (JA
6  Ex. 7).  Generally speaking, Transact and Reumont prevailed on most but not all of
7  the claims.

8          Now before this Court is the appeal of Appellants Frank D'Errico, RHFD,
9  and the D'Errico Living Trust.  Transact and Reumont are the Appellees.  This
10  appeal is No. SACV-13-1312.  Also before this Court is the cross-appeal of
11  Reumont from certain portions of the Judgment in favor of Appellants and Robert
12  Hall, and from the Order denying Reumont's request to amend the Judgment to add
13  an award of attorneys' fees in his favor.  (Cross-Appellant's Excerpts of Record
14  ("CAER"), CAER0162-28 to 29 (Docket No. 32-2)).  Reumont's cross-appeal is
15  No. SACV-13-1512.

16          Appellants elected the district court to hear the appeal and cross-appeal
17  pursuant to 28 U.S.C. § 158(c)(1)(B).  (Docket No. 3).  The appeal and cross-appeal
18  were consolidated, and oral argument was heard in this Court on both appeals on
19  June 23, 2014.  For the reasons set forth below, the Judgment is **AFFIRMED in**
20  **part and REVERSED in part.**  The matter is **REMANDED** for further
21  proceedings consist with this Order.  Reumont's cross-appeal is **DISMISSED**.

22                          **I.       BACKGROUND**
23          **A. Factual Background**
24          The trial court's Memorandum of Decision lays out extensive findings of fact
25  that are briefly summarized below.  (Memorandum of Decision ("MOD") at 5-34,
26  JA Ex. 6).
27          D'Errico and Hall formed RHFD for the purpose of developing and selling
28  vacant land located at 2716 Pebble Drive in Corona Del Mar, California.  (MOD at

2

5).  The property was listed for sale on January 9, 2006, and Reumont, president and CEO of Transact, executed a vacant land purchase agreement to purchase the property for $3,800,000 on January 24, 2006.  (*Id.* at 6).  On February 11, 2006, the parties executed a document entitled "Counter Offer No. 1," which changed certain terms and raised the purchase price to $4,200,000.  (*Id.*).  These two agreements together form the Purchase and Sale Agreement ("PSA").  The bulk of the purchase price was funded by a series of loans from RHFD to Transact and guaranteed by Reumont.  (*Id.* at 6-9).  Under the terms of the PSA, RHFD was responsible to procure approved plans from the City of Newport Beach to build an approximately 13,000-square-foot home on the vacant lot.  The plans were to be "released after 90 days."  (*Id.* at 11).

In April 2006, Hall provided Reumont preliminary plans for construction that were different from the plans submitted to and ultimately approved by the city.  (*Id.* at 11-12).  These original plans were stamped "Not for Const[ruction]."  (*Id.* at 12).  Hall told Reumont to rely on these original plans for budgetary purposes.  (*Id.*).  On and around June 22, 2006, Hall and Reumont discussed various changes that the city required before the plans could be approved.  (*Id.*).  Hall told Reumont on June 26, 2006, that the changes would not change the budget on the majority of the project.  (*Id.*).  The city approved and issued a set of plans on June 28, 2006.  (*Id.* at 13).  Despite RHFD's obligation to provide the plans to Transact under the PSA, Hall, on instructions from D'Errico, refused to provide the approved set of plans to Reumont unless Reumont paid $30,000 in permit fees.  (*Id.*).  RHFD did not provide the city-approved plans to Transact until on or around August 7, 2006.  (*Id.* at 15).  The city-approved plans required a larger foundation and retaining wall, which increased the overall construction budget by approximately $300,000.  (*Id.* at 16).

On July 11, 2006, after the city had approved construction plans but before the plans were delivered, the parties entered several loan agreements.  RHFD loaned $3,208,000 for purchase of the property, plus two additional loans for $400,000 and

$120,000 to partially cover the down payment for the property.  (*Id.* at 6-8).
D'Errico, as trustee for the D'Errico Living Trust, loaned Transact $3,240,000 for
construction of a home on the property (the "Construction Loan Agreement" or
"CLA").  (*Id.* at 9-10).  The CLA included $2,600,000 for construction costs, 15%
or $390,000 for a contractors' fee, $10,000 for inspection, and $240,000 for interest
reserve.  (*Id.* at 10).  The $2,600,000 allocated for construction was based on
budgeting under the original construction plans and a bid from contractor Gary
Guesman.  (*Id.* at 16, 20).

Once Reumont received the city-approved plans, he consulted with Tom
Bakehorn of South Cali Concrete ("South Cali"), who had rendered a bid to
construct the foundation based on the original plans, regarding the structural
changes to the foundation plans.  (*Id.* at 17).  Bakehorn indicated that the structural
changes would increase South Cali's bid from $225,000 to $525,000.  (*Id.*).
Reumont accepted this bid, based in part on D'Errico's prior statement that he
would be "flexible and reasonable" with the construction budget and allow funds to
be distributed between line-items in the budget to facilitate construction.  (*Id.*).
Reumont consulted with Bakehorn and concluded that the additional costs for the
foundation and retaining wall work could be reallocated from other line items in the
budget.  (*Id.*).

South Cali began work on the foundation in early September 2006.  (*Id.*).  On
September 7, 2006, D'Errico paid out a draw request on the CLA in the amount of
$151,616.  (*Id.* at 24).  On September 27, 2006, D'Errico paid out a second draw
request in the amount of $35,234.  (*Id.* at 25).  South Cali poured concrete for the
foundation on October 15, 2006, but stopped all work on the property on October
20, 2006.  (*Id.* at 17-18).

On October 31, 2006, D'Errico, Hall, and Bakehorn met to discuss a third
draw request on the CLA.  (*Id.* at 27).  Reumont gave Bakehorn authority to discuss
the payments and allocations on behalf of Transact.  (*Id.*).  Bakehorn provided a

number of documents along with the third draw request and insured D'Errico that if any further documents were needed, they would be provided as well. (*Id.* at 27-28). Bakehorn told D'Errico that invoices for construction work already performed were delinquent, and that there was not enough money in the budget to complete the project. (*Id.*). D'Errico ultimately refused to disburse the third draw request, based largely on the fact that the project had already exceeded the expected budget. (*Id.*).

On November 22, 2006, RHFD recorded a notice of default on the property. (*Id.* at 29). RHFD sent a notice of sale for the property on March 8, 2007. (*Id.*). Transact attempted to obtain alternate financing to complete construction on or around September 30, 2007, after filing for bankruptcy protection, but was ultimately unable to secure a loan after D'Errico told a prospective lender that Transact had "no chance of prevailing" in court against D'Errico. (*Id.* at 30).

### B. Procedural History

Transact and Reumont filed a complaint against D'Errico, RHFD, the D'Errico Living Trust, and Hall in state court on January 18, 2007. (*Id.* at 3). On May 17, 2007, Transact filed a voluntary Chapter 11 petition in bankruptcy. (*Id.*). The superior court case was removed to the bankruptcy court on January 2, 2008. (*Id.*). On March 18, 2008, the bankruptcy case was converted to Chapter 7, and thereafter the Chapter 7 trustee, John M. Wolfe, assumed control over Transact's litigation as the representative of the bankruptcy estate. (*Id.* at 4).

On April 20, 2011, Hall filed a voluntary Chapter 7 petition in bankruptcy. Reumont filed an adversary proceeding against Hall, which was consolidated with the Transact proceedings discussed above on February 9, 2012. (*Id.*).

On June 14, 2012, the trial court entered the operative Amended Joint Pretrial Order ("JPTO," JA Ex. 5), which was signed by all parties except Debora Medeiros, who later stipulated to the form and content of the JPTO at the pretrial conference. (MOD at 4). The trial began on March 4, 2013. (*Id.* at 5).

5

1   The MOD and Judgment issued on August 7, 2013.  The trial court ruled in

2   favor of Appellants on all but two of Transact's claims and all of Reumont's claims.

3   On Transact's claim for breach of the PSA, the trial court awarded Transact

4   $869,912 in compensatory damages and prejudgment interest against RHFD.  (*Id.* at

5   130).  On Transact's claim for breach of the CLA, the trial court awarded Transact

6   $526,365.93 in compensatory damages and prejudgment interest against D'Errico,

7   as trustee for the D'Errico Living Trust.  (*Id.* at 133).  The trial court ruled in favor

8   of Transact and Reumont on all of Appellants' cross-claims.

9   On August 26, 2013, Appellants filed a Notice of Appeal and Election to

10  Transfer.  (Docket No. 2-3).  Cross-Appellant filed his Notice of Appeal on

11  September 26, 2013 (Case No. SACV-13-1512, Docket No. 2), and an Amended

12  Notice of Appeal on October 23, 2013 (*id.*, Docket No. 3).  The appeals were

13  consolidated into the instant action on January 15, 2014.  (*Id.*, Docket No. 18).

14  Appellants appeal from the judgments rendered against them on: (a) the First

15  Claim for Relief for breach of contract brought by Transact against RHFD (MOD at

16  35-38); (b) the Second Claim for Relief for breach of contract brought by Transact

17  against D'Errico as trustee of the D'Errico Living Trust (*id.* at 39-48); (c) the First

18  Cross-Claim for breach of contract brought by RHFD against Transact and Reumont

19  (*id.* at 109-13); (d) the First Cross-Claim for breach of contract brought by D'Errico

20  as trustee of the D'Errico Living Trust against Transact (*id.* at 113-15); (e) the

21  Second Cross-Claim for intentional misrepresentation brought by D'Errico

22  individually and as trustee of the D'Errico Living Trust against Transact and

23  Reumont (*id.* at 115-16); (f) the Third Cross-Claim for negligent misrepresentation

24  brought by D'Errico individually and as trustee of the D'Errico Living Trust against

25  Transact and Reumont (*id.* at 117-18); (g) the Fourth Cross-Claim for false promise

26  brought by D'Errico individually and as trustee of the D'Errico Living Trust against

27  Transact and Reumont (*id.* at 118-19); and (h) the Seventh Cross-Claim for breach

28

of continuing guarantee brought by D'Errico as trustee of the D'Errico Living Trust and RHFD against Transact and Reumont (*id.* at 119-21).

Cross-Appellant appeals from the judgments rendered against him on: (a) the First Claim for Relief for breach of contract brought by Transact against RHFD (MOD at 35-38); and (b) the Second Claim for Relief for breach of contract brought by Transact against D'Errico as trustee of the D'Errico Living Trust (*id.* at 39-48). Cross-Appellant also appeals from the Memorandum and Order Dismissing Rule 59(e) Motion to Alter or Amend Judgment (Cross-Appellant's Excerpts of Record ("CAER"), CAER0162-23 to 30 (Docket No. 32-2)), in which the trial court denied Cross-Appellant's request for attorneys' fees.

## II.   DISCUSSION

### A. Standard of Review

The trial court's conclusions of law are reviewed de novo and findings of fact are reviewed for clear error. *Zurich Am. Ins. Co. v. Int'l Fibercom, Inc.*, 503 F.3d 933, 940 (9th Cir. 2007). "The interpretation of a contract is a mixed question of law and fact. When the [trial] court's decision is based on an analysis of the contractual language and an application of the principles of contract interpretation, that decision is a matter of law and reviewable de novo. When the inquiry focuses on extrinsic evidence of related facts, however, the trial court's conclusions will not be reversed unless they are clearly erroneous." *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985) (citing *In re U.S. Financial Securities Litigation v. Touche Ross & Co.*, 729 F.2d 628, 631-32 (9th Cir. 1984)).

The Supreme Court has described the clear error standard as follows:

Th[e clear error] standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty . . . if it undertakes to duplicate the role of the lower court. . . . If the [lower] court's account of the evidence is

1   plausible in light of the record viewed in its entirety, the court of

2   appeals may not reverse it even though convinced that had it been

3   sitting as the trier of fact, it would have weighed the evidence

4   differently.  Where there are two permissible views of the evidence, the

5   factfinder's choice between them cannot be clearly erroneous.

6  *Anderson v. Bessemer City*, 470 U.S. 564, 577, 105 S. Ct. 1504, 84 L. Ed. 2d 518

7  (1985).

8      **B.  Appellants' Breach of Purchase and Sale Agreement**

9          The trial court ruled that RHFD breached the PSA by failing to deliver a copy

10  of the city-approved plans to Transact.  (MOD at 36).  The court found that this

11  breached caused $530,000 in damages, because it resulted in the forfeiture of

12  Transact's down payments under the PSA.  (*Id.* at 130).

13         Appellants argue that the trial court erred in finding that RHFD breached the

14  PSA, because the city-approved plans were due on the same date as the close of

15  escrow, and the plans were in fact delivered on that date, notwithstanding the

16  parties' stipulation in the JPTO that the plans were delivered two weeks after the

17  close of escrow.  (Appellants' Opening Brief at 18-19).  Appellants further argue

18  that the trial court clearly erred both in finding that the delay in delivery of city-

19  approved plans caused the construction project to fail, and in finding that the delay

20  caused $530,000 in damages.  (*Id.* at 22-28).

21         **1.  Delivery of City-Approved Plans**

22         The trial court held that RHFD intentionally withheld the city-approved plans

23  from Transact.  The trial court found, pursuant to the parties' stipulation, that the

24  plans were delivered on or around August 7, 2006, two weeks after the close of

25  escrow.  (MOD at 15).  The trial court did not, however, make any explicit finding

26  regarding whether the plans were due prior to the date the city approved them, or

27  whether parties validly amended the date of delivery under the PSA.  Rather, the

28  trial court simply held that failure to deliver the plans was a material breach of the

8

1  PSA excusing Transact's obligation to pay for the property and the plans.  (*Id.* at

2  38).

### a.  Date of Delivery of City-Approved Plans

4          The trial court relied on the fact, stipulated by the parties in the JPTO, that

5  RHFD did not provide Transact with city-approved plans until August 7, 2006.

6  Appellants wish to be relieved of this stipulation because, they argue, it was

7  controverted by clear evidence presented at trial.  The trial court denied Appellants'

8  oral trial motions to amend the JPTO to conform to evidence presented.

9  (ADD0194:8-0196:11, ADD0228:14-0232:23, ADD0266:20-0267:23,

10 ADD0278:20-0280:12).  The Trustee argues that Appellants did not properly move

11 for relief from this particular stipulation.  (Trustee's Brief in Response at 15).  But

12 even assuming that the objection was properly made, Appellants cannot show that

13 the trial court's denial was an abuse of discretion.

14         A court has discretion to relieve a party of its stipulation.  One basis for such

15 relief is where there is substantial evidence contrary to the stipulation.  *See Coastal*

16 *States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1369 (5th Cir. 1983) (holding that district

17 court did not abuse its discretion in holding party to its stipulations where the

18 evidence against stipulated fact was not "so substantial" as to constitute an abuse of

19 discretion).  The trial court's denial of the motion to amend the JPTO is reviewed

20 for abuse of discretion.

21         Appellants have not shown that any evidence presented at trial clearly

22 contradicts the stipulated fact that RHFD did not deliver the plans until August 7,

23 2006.  While Reumont originally testified that he received the approved plans

24 shortly after the close of escrow, he changed his testimony on redirect.

25 (ADD0177:14-0178:11; TDD0087:5-0091:9).  On July 20, 2006, he signed a

26 document acknowledging receipt of certain documents, including "1 set of working

27 drawings with HOA stamp of approval."  (ADD0672).  And a receipt dated July 26,

28 2006, indicates that he spent $1374.66 on copies.  (ADD1049).

1       While all of this evidence could allow a factfinder to determine that RHFD

2   delivered the plans on or around July 20, it does not render the stipulated fact so

3   clearly false as to render the court's reliance on the fact unjust.  Additionally, there

4   is evidence in the record consistent with the stipulated fact.  Reumont, while

5   occasionally inconsistent in his recollection of his receipt of the city-approved plans,

6   maintained that he did not receive the plans until two weeks after the close of

7   escrow.

8       Accordingly, the trial court did not err in determining that the plans were

9   delivered on August 7, 2006.

10                                                **b.  Contractual Date for Delivery of Plans**

11       The trial court held that the delivery of the city-approved plans on August 7,

12   2006 was a willful breach of the PSA.  It also held that under the terms of the PSA,

13   RHFD was required to provide all plans to Transact within 90 days of the

14   agreement.  The trial court did not discuss, however, whether Transact was required

15   to deliver the plans before the plans existed.  On May 12, 2006, ninety days after the

16   PSA was executed, the city-approved plans did not yet exist because the city had not

17   approved any plans.

18       As this Court has previously stated, it appears that the trial court's decision

19   that RHFD breached the PSA was not based on the fact that the plans were not

20   delivered within 90 days of the PSA, but rather on the fact that the plans were not

21   delivered when they existed.  (Order dated August 28, 2013, at 3 (Docket No. 12)).

22   The trial court describes the breach as a willful failure to deliver the plans in order to

23   exact a payment from Transact that was not contemplated by the parties'

24   agreements.  (MOD at 37-38).  The breach could not have been willful until the

25   plans existed.

26       Furthermore, on April 28, 2006, the parties signed a document with the title

27   of "New Agreement Escrow to Amend as Follows."  ("Escrow Amendment,"

28   ADD0648).  The Escrow Amendment altered the terms of Appellees' deposits and

down payments on the PSA.  The date for payment of a $170,000 deposit was "extended until the plans have been approved by the city plus 8 days."  (*Id.*).  The Escrow Amendment contains no mention of the date for delivery of the city-approved plans.

Appellants argue that the Escrow Amendment changed the date for delivery of the city-approved plans.  The original PSA provided that RHFD was required to "release" the plans to Transact within 90 days of the agreement.  (ADD0445).  This date coincided with the date for the close of escrow.  Appellants argue that an agreement changing the date for the close of escrow necessarily changes the date for delivery of the plans.

The trial court did not discuss with any particularity the specific date on which the city-approved plans were due for delivery, including whether the obligation was temporarily excused until the city approved the plans, and whether the parties agreed to modify the date of delivery to the date escrow closed.  The trial court likely noticed that even if each of these open questions were answered in favor of Appellants, the plans were delivered late, resulting in a breach of the PSA.  But it is impossible to properly determine the amount of damages flowing from the breach without first determining the precise length of the delay in delivery of the plans.  Accordingly, the matter is **REMANDED** to the trial court for determination of the specific date on which the city-approved plans were due to be delivered.

### 2.  Waiver of Breach

Appellants argue that Transact waived its right to seek damages for the delay in delivery of the city-approved plans because it accepted the late delivery.  (Appellants' Opening Brief at 20-21).

"[W]aiver is the 'intentional relinquishment or abandonment of a known right.'"  *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (quoting *United States v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)).  While a party may lose the right to cancel the contract by continuing to act as

though it remains in force, as discussed below, a party generally does not waive its right to seek damages from the breach by failing to cancel the contract or otherwise seek immediate recompense for the breach. *See Jay Bharat Developers, Inc. v. Minidis*, 167 Cal. App. 4th 437, 443, 84 Cal. Rptr. 3d 267 (2008) ("Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided or continue its performance and sue for damages." (quoting *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 376 (3d Cir. 1992))); 14 Richard A. Lord, *Williston on Contracts* § 43.15 (4th ed. rev. 2014) ("*Williston*") (election to proceed on a contract despite breach does not waive the right to obtain damages for the breach).  Appellants have not pointed to any part of the record that would support a finding that Appellees intentionally relinquished or abandoned its right to seek damages for the failure to deliver the city-approved plans by the deadline.

### 3.  Materiality of Breach

The trial court held that the failure to deliver the city-approved plans was a material breach of the PSA that excused Transact's future obligations under the PSA.  Under California law, the materiality of a breach is a question of fact that is reviewed for clear error. *See Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1602-03 (2012) (citing *Brown v. Grimes*, 192 Cal. App. 4th 265, 277, 120 Cal. Rptr. 3d 893 (2011)).

The rulings of the trial court with respect to the materiality of the breach are clear error for two reasons. ***First***, the trial court measured damages based on a total failure to deliver the plans, despite the undisputed fact that the plans were delivered, albeit late. ***Second***, the trial court failed to consider the fact that Transact elected to proceed under the contract rather than cancel it, thus surrendering any right to withhold its future performance.

### a.  The Breach Was a Delay Only

The court described the breach as a "refusal of d'Errico and Hall to provide the City-Approved Plans to Reumont."  (MOD at 37-38).  The court goes on to discuss the reasons why the total failure to provide city-approved plans would be a material breach: it "went to the heart of the construction project," and rendered it "impossible" for Transact to develop and sell the property.  (*Id.*).

It is undisputed, however, that city-approved plans were provided to Reumont on August 7, 2006.  The breach was the delay between the time that the plans were to be delivered and the time that they were in fact delivered.  It was clear error for the trial court to hold that, because the ***total failure*** to deliver the plans would have been a material breach, this ***delay*** in delivery of the city-approved plans was a material breach.

The critical question is whether the time-of-performance term was so essential to the contract that failure to comply strictly with the term allowed Transact to cancel the contract and refuse to perform further.  "It has been held that when time is made of the essence of a contract, a failure to perform within the time specified is a material breach of the contract."  *Gold Mining & Water Co. v. Swinerton*, 23 Cal. 2d 19, 27, 142 P.2d 22 (1943) (holding that the time of performance was essential to a lease agreement that required removal of minerals from the property in order to take advantage of the "1937-1938 water and mining season").  The intent to make time "of the essence" must be "clearly, unequivocally and unmistakably shown or expressed in the document."  *Cushing v. Levi*, 117 Cal. App. 94, 104, 9 P.2d 958 (1931) (holding that time was not essential to a contract which merely prescribed the day on or before which payment was to be made).

The trial court conducted no analysis of whether the time for delivery of the city-approved plans was made of the essence in the PSA.  Moreover, there appears to be no evidence in the record that could support such a finding.  The language of the PSA does not reveal that delivery within 90 days was essential to either the

13

1   purchase of the property or the construction plans. There is no evidence that the

2   parties contemplated that late delivery of the plans would materially change the

3   course of construction. Appellees do not suggest that they would have gotten better

4   deals with their contractors if the approved plans were delivered in June rather than

5   in August.

6        Reumont argues that if the plans were delivered in June, prior to the close of

7   escrow, the deal would have unraveled and Reumont would have avoided default.

8   (Reumont's Response Brief at 17). Reumont's primary qualm with the city-

9   approved plans was not the date of their delivery, but their content: the city-

10   approved plans increased the expected cost of construction because the city required

11   a larger foundation and retaining walls than what Reumont had expected would be

12   required under the preliminary plans. Reumont's argument is belied by the fact that

13   the deal did not, in fact, unravel when the plans were delivered in August. Rather,

14   Reumont reviewed the plans once he received them, solicited new bids from his

15   contractors, and worked out a plan with D'Errico to continue the project. If the city-

16   approved plans were so deficient that Appellees would have refused to continue the

17   deal, there is no reason that they could not have done so in August just as Reumont

18   claims they would have done in June.

19        Furthermore, the trial court held that neither Hall nor D'Errico fraudulently

20   induced Transact or Reumont to enter into further contracts by representing that the

21   original plans were sufficient to craft a budget and that the city-approved plans

22   would not significantly increase the overall budget of the project. (MOD at 51-52).

23        The trial court reasoned that this breach was material because it was willful

24   and it occurred at the outset of performance. (MOD at 37). A slight breach at the

25   outset of performance may justify termination, because it indicates difficulty in

26   obtaining performance in the future and is unlikely to inflict a forfeiture on the

27   breaching party. 1 Witkin, *supra*, § 852. Here, the parties continued to negotiate

28   and do business with one another even after the occurrence of the breach. Reumont

1  appeared to believe that the city-approved plans would be delivered upon resolution

2  of the parties' dispute over payment of permit fees.  RHFD's future performance

3  was not implicated.  Furthermore, the parties went ahead and closed escrow after

4  RHFD's breach and before the ultimate delivery of the plans in August.  Not only

5  does this show Reumont's objective belief that he would receive the city-approved

6  plans, but it also shows that the breach was not at the "outset" of performance, since

7  the property itself was conveyed before the plans were delivered.

8      Likewise, the willfulness of a breach may bear on its materiality because an

9  unimportant or unintended departure from the terms of the contract may still

10 constitute substantial performance.  *See Bonadelle Constr. Co. v. Hernandez*, 169

11 Cal. App. 2d 396, 399, 337 P.2d 85 (1959) (holding that willful failure to perform a

12 material part of a contract justified rescission, in part because substantial

13 performance requires "no willful departure from the terms of the contract").  Again,

14 the reason willfulness bears on the materiality of a breach is that one party's willful

15 failure to perform gives rise to a justifiable concern about that party's willingness to

16 perform in the future.  Once that concern arises, the party is justified in ceasing its

17 own performance and treating the contract as terminated.  Here, although RHFD

18 intentionally withheld the plans once they existed, Reumont clearly was not

19 concerned about the likelihood that he would receive the plans in the future because

20 he continued with the close of escrow, retained the benefits he received under the

21 contract, and treated the contract as continuing in full force.

22          **b.  Transact Elected to Keep the Contract in Force**

23     Even if the late delivery of the city-approved plans was a material breach, the

24 trial court erred in holding that the breach excused Appellees' further performance

25 under the PSA even after Appellees elected to continue to receive benefits and

26 render performance under the contract.  When one party to a contract commits a

27 material breach, the other party "can either elect to allege a total breach, terminate

28 the contract and bring an action or, instead, elect to keep the contract in force,

declare the default only a partial breach, and recover those damages caused by that partial breach." 13 *Williston*, *supra*, § 39:32; *Leiter v. Eltinge*, 246 Cal. App. 2d 306, 317, 54 Cal. Rptr. 703 (1966) (holding that failure to give timely notice of cancellation following material breach and treating the contract as binding after knowledge of the breach is an election to affirm the contract and a waiver of the right to rescind the contract for material breach); *LeClercq v. Michael*, 88 Cal. App. 2d 700, 199 P.2d 343 (1948) (delay in rescission following fraud constitutes affirmance of the contract).

Under no circumstances can the non-breaching party elect to treat the contract as continuing in force while reserving the right to terminate the contract at any time later. 14 *Williston*, *supra*, § 43.5; *see also Restatement (Second) of Contracts* § 246(1) (1981) ("[A]n obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence . . . ."). The non-breaching party "must ***choose*** between continuing performance and ceasing performance." 14 *Williston*, *supra*, § 43.5 (emphasis added) (citing *N.Y. Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206 (Tex. Ct. App. 2013)). The election to continue performance is a choice between two inconsistent rights following the breach: "[T]he injured party could not have had both rights. That party's only right is to make a choice." 13 *Williston*, *supra*, § 39:32.

The law required Appellees, upon receiving notice of RHFD's breach, to make an election either to continue to receive the benefits and render performance under the PSA, or to terminate the contract and exercise the right of rescission that arises from a material breach. Appellees made a clear choice to treat the contract as alive, which revived their obligations thereunder. Appellees accepted late delivery of the city-approved plans on August 7, 2006. They made two monthly interest payments as required under the PSA. They continued with their plan to construct a

16

1   home on the property, conducting excavation and laying a concrete foundation on

2   October 15, 2006.  (MOD at 17-18).

3       If Appellees had chosen to terminate the contract, they would have been

4   entitled to rescission.  A necessary component of a non-breaching party's exercise

5   of its right to rescission is the return of all consideration received under the contract.

6   26 *Williston*, *supra*, § 68:24 ("Not only must one seeking rescission ordinarily return

7   or offer to return any benefit received, but he or she may not do anything that could

8   be interpreted as affirming the contract or transaction.").  Under no circumstances

9   could Appellees cease performance under the contract but retain the benefits they

10  had received and not yet paid for.  Otherwise, the breach would work an undeserved

11  and inequitable windfall for Appellees.

12      Accordingly, the trial court clearly erred in holding that RHFD's breach of its

13  obligation to deliver city-approved plans was material and excused Transact's future

14  performance under the PSA.

### 4.  Damages

16      As the trial court noted, the correct measure of damages resulting from

17  RHFD's breach of the PSA is expectancy damages: an amount sufficient to

18  compensate Transact for the detriment proximately caused by the breach, Cal. Civ.

19  Code § 3300, and place Transact in the position it would have held had RHFD fully

20  and properly performed, *id.* § 3358.  *See Brandon & Tibbs v. George Kevorkian*

21  *Accountancy Corp.*, 226 Cal. App. 3d 442, 468, 277 Cal. Rptr. 40 (1990) (affirming

22  the lower court's award of lost profit damages from breach of a joint-venture

23  agreement, but holding that the court had erred in failing to offset the award by the

24  plaintiff's profits from mitigation).  Under no circumstances may the damages

25  exceed the benefit that the non-breaching party would have received if the contract

26  had been fully performed.  Cal. Civ. Code § 3358.  "Causation of damages in

27  contract cases, as in tort cases, requires that the damages be proximately caused by

28  the defendant's breach, and that their causal occurrence be at least reasonably

certain." *Vu v. Cal. Commerce Club, Inc.*, 58 Cal. App. 4th 229, 233, 68 Cal. Rptr. 2d 31 (1997) (citing Cal. Civ. Code §§ 3300, 3301).  Damages may be awarded either for those losses that naturally arise from the breach, or those that might reasonably have been foreseen by the parties at the time they contracted as the probable result of the breach.  *See Glendale Fed. Sav. & Loan Ass'n v. Marina View Heights Dev. Co.*, 66 Cal. App. 3d 101, 125, 135 Cal. Rptr. 802 (1977).

Had RHFD fully and properly performed its duty to deliver the city-approved plans, Transact would have been in possession of the plans approximately six weeks before the plans were ultimately delivered.  The content of the plans would have been identical.  The proper measure of expectancy damages resulting from this breach is any harm Appellees can prove resulted from the delay itself.

Neither the MOD nor the briefs of the parties point to any evidence in the record suggesting harm that resulted from the delay in delivery of the plans.  There is no evidence that Reumont would have been able to receive better deals from his contractors or suppliers in June than in August.  There is no evidence that the construction schedule would have substantively changed at all.  Indeed, construction could not have begun in any event until the close of escrow.

The trial court reasoned that the failure to deliver city-approved plans caused the construction project to be jeopardized and eventually halted.  But the trial court's reasoning was based on a total failure to deliver the plans: "The construction project transaction was predicated on [RHFD]'s delivery of plans to build the Custom Home.  Without accurate plans, the construction project would fail.  Transact's purpose in purchasing the Pepple Property was to develop it and sell it.  Without complete construction plans, this expectation was impossible."  (MOD at 38).  The trial court erred in measuring the breach as a total failure to deliver the plans, when it is undisputed that accurate, complete construction plans were delivered by August 7, 2006.  The holding that construction and sale of the property was "impossible"

1  was clear error in the absence of any evidence in the record suggesting that

2  construction and sale could not occur after August 7.

3       While it is true that the construction project eventually stopped, there is no

4  evidence suggesting that the project would have succeeded if Reumont had access to

5  the plans six weeks earlier.  Conduct is not a substantial factor or but-for cause of

6  harm if the same harm would have resulted without the conduct.  *See Mayes v.*

7  *Bryan*, 139 Cal. App. 4th 1075, 1095, 44 Cal. Rptr. 3d 14 (2006) (citing CACI jury

8  instruction 430 and concluding that the "substantial factor" test subsumes the "but-

9  for" causation test).   Presumably, Reumont would have received the same bids from

10 contractors and suppliers in June that he received in August.  While the content of

11 the plans increased the total cost of construction, because the city required expanded

12 foundation and retaining walls, there is no indication in the record that the date of

13 delivery of the plans increased the budget.

14      The trial court further erred in awarding the return of Transact's deposits as

15 expectancy damages.  The return of monetary outlays under the contract is a classic

16 form of restitution.  While expectancy damages look forward to the benefits the non-

17 breaching party would have enjoyed had the contract been performed in full,

18 restitution looks backward and attempts to return the parties to their respective

19 positions before the contract was formed.  Under California law, "damages and

20 restitution constitute alternative remedies and an election to pursue one is a bar to

21 invoking the other."  *Jozovich v. Cent. Cal. Berry Growers Ass'n*, 183 Cal. App. 2d

22 216, 229, 6 Cal. Rptr. 617 (1960); *see* 1 Witkin, *supra*, § 854 (discussing election

23 between restitution and damages).

24      The benefit Transact would have received had the PSA been fully and

25 properly performed was ownership of the property and city-approved plans for

26 construction of a custom home on the property.  If the contract had been performed,

27 Transact would not have been entitled to the return of its deposits.  Return of the

28 deposits is thus a form of restitution, rather than damages.

1    Restitution is a component of recovery available when an aggrieved party
2    seeks rescission of the contract.  The party entitled to rescission "shall be awarded
3    complete relief, including restitution of benefits, if any, conferred by him as a result
4    of the transaction and any consequential damages to which he is entitled; but such
5    relief shall not include duplicate or inconsistent items of recovery."  1 Witkin,
6    *supra*, § 936 (citing Cal. Civ. Code § 1692).  "Under the doctrine of election of
7    remedies, a party claiming breach of contract must decide whether to seek damages
8    or rescission.  The doctrine 'prevents a plaintiff from both repudiating [a] contract
9    and then suing on it to gain the benefit of the bargain.'"  *Sharp Structural, Inc. v.*
10   *Franklin Mfg., Inc.*, 283 F. App'x 585, 589 (9th Cir. 2008) (alteration in original)
11   (some internal quotation marks omitted) (citing 2 Dan B. Dobbs, *Law of Remedies* §
12   9.4, at 607 (2d ed. 1993); *Landin v. Ford*, 151 Ariz. 278, 727 P.2d 331, 332 (1986)).
13   In order to receive restitution on account of a breach, the non-breaching party must
14   restore to the other party everything of value that it has received from the other party
15   under the contract.  *More v. Calkins*, 85 Cal. 177, 190, 24 P. 729 (1890) (upholding
16   demurrer of claim for rescission because the complaint failed to state that the
17   plaintiff "ever restored or offered to restore . . . to defendant the money loaned to
18   and paid . . . under the contract").

19   Transact is not entitled to restitution—it "has elected to sue for damages"
20   instead of rescission.  (MOD at 128).  Furthermore, as the trial court held and no
21   party has properly appealed, Transact is not entitled to consequential damages to
22   compensate it for lost profits from the expected construction and sale of the custom
23   home.  (*Id.* at 127).

24   Accordingly, the trial court erred in its determination of both the type of
25   damages available to Transact to compensate for the breach, and the amount of
26   damages resulting from the breach.

27

28

20

### 5.  Causation and Failure to Mitigate of Damages

The trial court found as fact that the city-approved plans were available to Reumont for purchase and inspection at the City of Newport Beach.  (MOD at 26). Appellants argue that the fact that Reumont could have purchased the plans himself on June 28, 2006, shows that Transact's damages were not caused by RHFD's breach, but rather by his own inaction.  Indeed, if Reumont was able to purchase and inspect the city-approved plans, and Transact incurred damages from waiting for RHFD to deliver the plans, then Reumont's recovery should be limited to the cost of obtaining the plans by alternate means, either because he failed to reasonably mitigate his damages or because the damages were not caused by the breach.

"Failure to mitigate damages, however, is a matter of affirmative defense that must be pleaded and proved . . . ."  *Mayes v. Sturdy N. Sales, Inc.*, 91 Cal. App. 3d 69, 86, 154 Cal. Rptr. 43, 54 (1979) (citing *Baruh v. Kuhl*, 213 Cal. App. 2d 266, 273, 28 Cal. Rptr. 573 (1963)).  Failure to raise mitigation as an affirmative defense "ordinarily would constitute a waiver."  *999 v. CIT Corp.*, 776 F.2d 886, 870 n.2 (9th Cir. 1985).  Failure to raise a defense in a pretrial order additionally constitutes waiver.  *Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988).

The Court finds that the failure to mitigate damages was properly raised in the trial court.  Although the JPTO does not contain a mitigation defense as such, it indicates that "whether Plaintiffs were negligent" remained to be decided, which can be interpreted as preservation of a mitigation defense.  (JPTO at 38).  The issue appears to have been litigated at trial, because the trial court found as fact that the city-approved plans were available to Reumont for inspection and purchase from June 28, 2006.  (MOD at 15).  Furthermore, Reumont's ability to obtain the plans for a small fee from the city goes directly to causation: if Reumont could have easily obtained the plans at any time, then the failure to deliver the plans did not cause any

21

1  more damage than the cost to obtain the plans from the city.  And finally, neither the

2  Trustee nor Reumont argues that the mitigation defense was waived.

3        Accordingly, if Transact is able to prove on remand that any damages resulted

4  from the delay in delivery of the city-approved plans, its recovery is limited to the

5  cost of obtaining a copy of the plans directly from the city.

6        **6.  Conclusion**

7        The decision of the trial court on this claim is **REVERSED** and

8  **REMANDED** for determination of the contractual date on which delivery of the

9  city-approved plans was required, and the proper amount of damages.  The trial

10  court may, in its discretion, either use the existing record developed at trial or

11  receive additional evidence.  *See, e.g.*, *In re YBA Nineteen, LLC*, Civil No.

12  13CV1326–WQH–RBB, 2013 WL 3288894, at *10 (S.D. Cal. June 28, 2013) ("On

13  remand, the Bankruptcy Court shall reconsider . . . the existing record and any other

14  new evidence the Bankruptcy Court allows the parties to present."); *In re Howe*,

15  Nos. CV 07-03483 AHM, SV 02-11958-GM, 2008 WL 4184640, at *4 (C.D. Cal.

16  Sept. 5, 2008) ("[A]lthough the BAP did not require the Bankruptcy Judge to

17  receive more evidence on remand, it also did not prohibit it from doing so.").

18        **C.  <u>Appellants' Breach of the Construction Loan Agreement</u>**

19        The trial court held that D'Errico (as trustee for the D'Errico Living Trust)

20  breached the CLA by failing to fund the third draw request in spite of Transact's

21  substantial performance of its obligations under the agreement.  (MOD at 46).

22  Appellants challenge this ruling, arguing that D'Errico was not responsible for

23  funding the third draw, because his performance was excused by Transact's breach.

24  (Appellants' Opening Brief at 28-38).

25        The CLA is represented by a short, handwritten, nonintegrated agreement

26  lacking in significant detail to guide the trial court in interpretation.  The court made

27  two key holdings with respect to the interpretation of contractual terms: It held that

28  the requirement that "disbursements . . . be made to Transact, Inc. only if

22

1  corporation is in good standing within Nevada and California" was an express

2  condition precedent to D'Errico's performance, while the requirements that

3  "[c]ontracts from general and subcontracts must be provided, invoices, labor and

4  material released must be provided," and "[a]ll insurances and license must be

5  provided" were not conditions precedent to D'Errico's performance.  (MOD at 40,

6  43).  The trial court did not make any findings as to the intent of the parties as to

7  D'Errico's rights that would arise in the event that Transact defaulted by spending

8  beyond the budget.

9        **1.  Good Standing in California and Nevada**

10              **a.  Interpretation**

11        The trial court held, and no party has properly appealed, that Transact's good

12  standing in California and Nevada was an express condition precedent to D'Errico's

13  obligation to disburse funds under the CLA.  (MOD at 40).  This Court will not

14  disturb this ruling.

15              **b.  Waiver**

16        The trial court held that D'Errico waived his right to insist that Transact be a

17  corporation in good standing in California and Nevada as a condition precedent to

18  his disbursement of funds under the CLA by funding the first two draw requests

19  knowing that Transact was not in good standing.  A finding of waiver by conduct is

20  a question of fact reviewed for clear error.

21        "A condition is waived when a promisor by his words or conduct justifies the

22  promisee in believing that a conditional promise will be performed despite the

23  failure to perform the condition, and the promisee relies upon the promisor's

24  manifestations to his substantial detriment."  *Sosin v. Richardson*, 210 Cal. App. 2d

25  258, 264, 26 Cal. Rptr. 610 (1962) (holding that the defendant had waived a

26  condition precedent to his promise to pay back a loan from plaintiffs, because the

27  defendant had indicated to plaintiffs by his conduct that they need not purchase a

28

1  certain parcel of land in satisfaction of the condition, and plaintiffs consequently

2  failed to purchase the parcel).

3      The trial court's finding that this condition had been waived was supported by

4  substantial evidence in the record.  D'Errico knew that Transact was not a

5  corporation in good standing when he paid the first two loan draws.  He did not

6  appear particularly concerned with its lack of good standing.  (MOD at 42).

7  Moreover, Transact relied on this manifestation to its substantial detriment by

8  continuing to enter contracts and make purchases toward construction under the

9  belief that these outlays would be reimbursed under the CLA.

10     Appellants' suggestion that they were prevented from providing testimony

11  about waiver is baseless.  The trial court told Appellants' counsel to "move on" after

12  Reumont had answered several questions about his discussions with D'Errico about

13  the good standing requirement, because, as the trial court stated, Reumont had

14  already testified to the facts that counsel was trying to elicit.  (ADD0202-04).  Even

15  after this admonition, the trial court allowed counsel to continue asking questions

16  about Transact's corporate registration.  And the trial court's comment that "we

17  don't need to take testimony on this" was made in response to a line of questioning

18  relating to whether Reumont believed Transact was in good standing or knew the

19  requirements for good standing, which was irrelevant to any claim.  (ADD0126).

20              **2.  Supporting Documentation**

21                  **a.  Interpretation**

22     The trial court held that the express language of the CLA requirements that

23  "[c]ontracts from general and subcontracts must be provided, invoices, labor and

24  material released must be provided," and "[a]ll insurances and license must be

25  provided" were not conditions precedent to D'Errico's performance.  (MOD at 43).

26  The court reasoned that these requirements "are not phrased as conditions precedent.

27  Instead, the [CLA] simply states that the supporting documentation 'must be

28  provided.'"  (*Id.*).  Accordingly, the trial court interpreted these terms as creating an

1  obligation in Transact to provide supporting documentation within a reasonable

2  time. (*Id.*).

3        Appellants argue that this interpretation is invalid as a matter of law.  In

4  support, Appellants point to a number of sources of extrinsic evidence of the

5  contract's meaning that were before the trial court.  Specifically, Appellants claim

6  that the contract was a "percentage of completion" construction loan, under which

7  D'Errico was only required to make payments up to the percentage of construction

8  that had been completed.  Neither the words "percentage of completion" nor any

9  similar language appears in the CLA.  Nevertheless, Appellants argue that the

10  parties "all agreed that reimbursement depended on the 'progress of construction.'"

11  (Appellants' Opening Brief at 34).  Furthermore, Appellants point to an email Hall

12  sent to Reumont on June 30, 2006, detailing "the basic procedures for any

13  construction loan," under which D'Errico would "process each request and fund the

14  monies based on the progress of the job" after Transact submitted invoices and other

15  documents and Hall inspected the progress of the work.  (ADD0658).  Because the

16  handwritten CLA contained no integration clause, and because the language "must

17  be provided" is ambiguous, parol evidence relating to its interpretation is

18  admissible. *See Pac. Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*,

19  69 Cal. 2d 33, 37, 69 Cal. Rptr. 561 (1968) (extrinsic evidence admissible to explain

20  the meaning of a written instrument so long as the evidence is relevant to prove a

21  meaning to which the language of the instrument is reasonably susceptible).

22        When the interpretation of a contract is based on the language of the

23  agreement and legal principles of contract interpretation, the reviewing court

24  conducts a de novo review of the trial court's decision.  On the other hand, when the

25  court's inquiry is based on extrinsic evidence and other findings of fact, the

26  reviewing court reviews only for clear error. *Miller*, 758 F.2d at 367.  Here, the trial

27  court appeared to base its decision solely on the language of the agreement: it held

28  that the language "must be provided" showed that the terms were "not phrased as

1  conditions precedent," and thus were not conditions precedent.  (MOD at 43).  This

2  holding is reviewed de novo.

3       The trial court erred in failing to consider extrinsic evidence of the intent of

4  the parties in concluding that this contractual language did not create a condition

5  precedent.  In fact, the language "must be" points just as clearly to the parties' intent

6  to create a condition than to create an obligation.  *See, e.g.*, *Platt Pac., Inc. v.*

7  *Andelson*, 6 Cal. 4th 307, 313-14, 24 Cal. Rptr. 2d 597 (1993) (holding that when

8  the parties agree that an arbitration demand must be made within a certain time, the

9  demand is a condition precedent to the arbitration).  Under a common definition of

10 conditions precedent cited in California cases, "an act of a party that ***must be***

11 performed . . . before the contractual right accrues" is a condition precedent.  *Id.* at

12 313 (emphasis added) (citing Cal. Civ. Code § 1436).  Use of the phrase "must be

13 provided" does not unambiguously suggest that the parties intended the provision of

14 supporting documentation to be an obligation and not a condition.

15      Furthermore, considering the written document as a whole, it is more likely

16 that the parties intended the provision of supporting documentation to be a condition

17 precedent to payment.  The contract provides procedures for inspection of the

18 property by D'Errico and his agent and procedures for dispute resolution.  "Robert

19 Hall will conduct inspections as to progress of construction, ***as it related to***

20 ***construction loan disbursement***, and provide report . . . . If a dispute [arises

21 thereto,] Robert Hall and Gary G[uesman] will have 3 days (business) to

22 compromise or an outside inspector . . . will be designated to ***resolve the***

23 ***disbursement issue***."  (MOD at 10 (emphasis added)).  These terms of the CLA

24 appear to contemplate that disputes may arise regarding the amount D'Errico is

25 required to disburse based on the information contained in Transact's supporting

26 documentation and Hall's inspection report.  These terms would provide little

27 protection if D'Errico were required to make all disbursements even if Transact

28 provided no supporting documentation.  In fact, according to the trial court's "plain

meaning" interpretation, Transact could have demanded the entire amount of the loan without providing any documentation, and D'Errico would have been required to disburse the funds subject only to a right to receive supporting documentation within a reasonable time.  This interpretation is unreasonable in light of the intrinsic and extrinsic evidence of the parties' intent.

Ordinarily, the Court would remand this issue to the trial court for consideration of extrinsic evidence as to whether supporting documentation was a condition precedent or a mere obligation.  Here, however, the error was harmless because the trial court's finding that Transact substantially complied with its obligation to provide supporting documentation was not clear error.

### b.  Substantial Compliance

The trial court found that Transact provided supporting documentation related to the third draw within a reasonable time, and the supporting documentation was substantially compliant with the terms of the CLA.  (MOD at 44).  This finding of fact is reviewed for clear error.

The doctrine of substantial performance allows a party to avoid a forfeiture by requiring the non-breaching counterparty to render its performance while retaining the right to sue for the difference in value between the full performance and the substantial performance.  14 *Williston*, *supra*, § 42:4.  "What constitutes substantial performance is a question of fact, but it is essential that there be no wilful departure from the terms of the contract, and that the defects be such as may be easily remedied or compensated, so that the promisee may get practically what the contract calls for."  1 Witkin, *supra*, § 818.

Appellants argue that that the finding of substantial performance was clear error because the supporting documentation was deficient, certain parts of the documentation contained intentional misrepresentations, and Appellants were unable to conduct any investigation about the supporting documentation.

### i.  Sufficiency of Supporting Documents

Appellants suggest that the supporting documentation was deficient because the draw book presented to D'Errico did not contain all documents required for a proper draw request.  The draw book, Appellants argue, did not contain all required insurance documents, full proofs of payment, or an unconditional waiver and release for each invoice.  (Appellants' Opening Brief at 36).  The draw book submitted into evidence was, in fact, missing these documents.  (ADD0699-779).

The CLA required "contracts," and "invoice, labor and material released" as supporting documentation.  Although invoices are required, it does not appear from the text of the CLA that a full proof of payment or an unconditional waiver and release is required as supporting documentation for each invoice.  (MOD at 10). The trial court could reasonably have concluded that by providing invoices themselves, without providing a full proof of payment or unconditional waiver and release, Transact substantially complied with its obligation to provide supporting documentation.

The CLA requires production of "all insurances and license" as supporting documentation.  Appellants suggest that the draw book included no insurance documentation.  The draw book submitted into evidence appears to contain no supporting insurance documentation.  It is not clear from the terms of the CLA, however, that "insurances and license" must be provided along with invoices in order for Transact to be entitled to payment of invoices.  The trial court did not clearly err in finding that the draw book contained sufficient documentation, even without specific insurance paperwork, to constitute substantial compliance with Transact's obligation to provide supporting documentation.  Furthermore, the trial court found that D'Errico provided the first two construction draws despite that the paperwork was "a mess," and that D'Errico believed the paperwork supporting the third draw was more complete than the first two.  (*Id.* at 44).

28

### ii.  Intentional Misrepresentations

Appellants argue that the supporting documentation was necessarily deficient because it contained intentional misrepresentations and fraud.  Willful departure from the terms of a contract cannot constitute substantial performance.  1 Witkin, *supra*, § 818.

The trial court found that Appellants did not prove that Reumont falsified or otherwise fraudulently submitted invoices.  (MOD at 116).  Appellants contend that this finding is clearly erroneous because Appellants presented undisputed and uncontroverted evidence of fraudulent invoices, and the trial court did not mention this evidence in its finding.  Appellants point to the testimony of Debora Medeiros, Reumont's assistant, and Alex von der Launitz, the president of South Cali Concrete, one of Appellees' subcontractors.  Both Medeiros and von der Launitz testified to their personal knowledge that Reumont falsified invoices.

The trial court's finding was not clear error because there is evidence in the record on which the court could have concluded that the invoices were not fraudulent: the invoices themselves and Reumont's statements that they were valid. The trial court could have determined that the testimony of Medeiros and von der Launitz was not credible.

### iii. Failure to Allow Inspection

Appellants further suggest that the third draw book was not substantially compliant because Transact did not allow D'Errico to keep the copy of the book it provided him during the meeting on October 31, 2006.  Without a copy of the draw request, Appellants argue, D'Errico and Hall were unable to properly inspect the documents.  Although D'Errico testified that Bakehorn left the meeting with the copy of the draw book, the trial court could reasonably have discounted D'Errico's testimony and concluded that D'Errico had full access to the draw book.  It is not indisputably clear from the record that Transact refused to provide D'Errico with a

1  copy of the supporting documentation, and thus the trial court's determination to the

2  contrary was not clear error.

3  Finally, Appellants argue that the third draw request did not comply with the

4  terms of the CLA because Hall did not investigate the progress of construction and

5  the parties did not engage in the prescribed dispute resolution procedure in the CLA.

6  Neither of these terms, however, is an express condition that Transact was required

7  to fulfill before being entitled to payment. Nothing in the language of the CLA

8  suggests that it is Transact's responsibility to ensure that Hall—D'Errico's business

9  partner who at times acted as D'Errico's agent—investigated the construction

10 progress. And if either party was required to engage in the dispute resolution

11 process, it was D'Errico, who complained that Transact's performance was deficient

12 and summarily refused to disburse further funds.

13 Accordingly, the trial court did not err in holding that Transact substantially

14 complied with its obligation to produce supporting documentation along with its

15 draw requests.

16 ### 3.  "Percentage of Completion"

17 #### a.  Interpretation

18 The trial court's interpretation of the CLA notably fails to include any

19 discussion of the body of extrinsic evidence showing that the parties intended to

20 enter into a "percentage of completion" construction loan, whereby disbursements

21 would be made based the progress of construction rather than the amount spent on

22 construction. The term "percentage of completion" does not appear in the language

23 of the CLA, but the CLA is not an integrated document. The contract includes not

24 only terms set forth in the handwritten agreement, but also those agreed on verbally

25 or through conduct, so long as the parties intended to be bound to those terms. This

26 question of contract interpretation is reviewed de novo, because there is no

27 indication that the trial court's failure to examine the question was based primarily

28 on review of extrinsic evidence. *See Miller*, 758 F.2d at 367 (questions of

contractual interpretation reviewed de novo if the trial court's interpretation was based on the language of the written instrument).

The parties appeared to agree and understand at all times that disbursements on the CLA were based on the percentage of completion of construction. An e-mail from Hall to Reumont on June 30, 2006, before the CLA was signed, indicated the "basic procedures" of the loan, under which D'Errico would "process each request and fund the monies based on the progress of the job" after Transact submitted invoices and other documents and Hall inspected the progress of the work. (ADD0658). There is evidence that the parties agreed that industry custom and practice for construction loans would dictate disbursement: Hall stated that these terms would apply to "any construction loan." (*Id.*).

Even as the deal began to go sour, the parties continued to act in line with an expectation that disbursements were based on the progress of construction. In a meeting with D'Errico on October 16, 2006, Reumont acknowledged that disbursements were based on progress on the budget, and he asked D'Errico for what he believed were reasonable and typical "adjustments" to the budget. (ADD0838). D'Errico stated, "when you're 99 percent done, I'll pay 99 percent." (ADD0839). The parties then discussed various ways to reallocate portions of the budget, in accordance with D'Errico's agreement to "be flexible" on the percentage of progress requirement. (ADD0905). In the meeting on October 31, 2006, Bakehorn requested that D'Errico "move [the] budget around," because "[o]bviously, there's not enough money in that budget to do the project as budgeted." (ADD0970, ADD0973).

It appears clear from this extrinsic evidence that the parties contemplated that disbursements would be based on the progress of construction. The trial court's interpretation of the agreement fails to give effect to the parties' intent on this point. The trial court held, based solely on the terms in the written CLA, that there were no conditions precedent to D'Errico's obligation to pay apart from the requirement that

Transact be a corporation in good standing.  The extrinsic evidence makes clear that the parties contemplated that Transact could default by requesting disbursements that exceeded the agreed-upon budget.  What is not clear is the precise extent of D'Errico's right to refuse further funding based on percentage of completion.

### b.  Disposition

While the trial court did not explicitly determine that D'Errico's performance was conditioned on the progress of construction, it made a number of findings related to the budget overrun.  These findings suggest that the trial court may have determined that any obligation with respect to the progress of completion was discharged, either because the third draw did not exceed the overall budget, or because Transact justifiably relied on D'Errico's representations that he would be flexible in disbursements.

The trial court held that the budget overrun did not excuse D'Errico's duty to fund the third draw.  The trial court found that the approved construction budget was based on the original plans, which D'Errico and Hall provided to Reumont for budgetary purposes but failed to update when the city-approved plans became available.  The trial court also found that D'Errico agreed to "be flexible and reasonable in disbursing on the Construction Loan," and that Transact justifiably relied on this representation in making its construction plans and choosing to enter into a contract to build the foundation knowing that the cost would exceed the budget allocation.  The trial court determined that it was always the intent of the parties to "shift funds around between and among line items to facilitate funding of the construction project."  (MOD at 46).  Finally, the third draw only sought payments in excess of certain line items in the budget, and not the overall budget. (*Id.* at 45 & n.11).

In holding that the budget overrun did not excuse D'Errico's duty to fund the third draw because the third draw request did not exceed the overall budget, the trial court did not give effect to the intent of the parties that D'Errico's responsibility

would be contingent on the progress of completion.  Under this reasoning, D'Errico was required to continue making disbursements until he had disbursed the entire amount of the loan, and only then could he stop lending money on the ground that the progress of construction was insufficient.  This interpretation is not supported by the evidence and does not give effect to the intent of the parties.  While the parties may have agreed to allow reasonable diversion from the budget where the circumstances warranted it, there is no evidence suggesting intent to eviscerate the budget entirely.

It is not clear whether the trial court believed that principles of promissory estoppel bound D'Errico to fund the third draw.  The trial court focused on D'Errico's role in the budget overrun: that he and Hall provided Reumont with a draft set of plans that differed from the ultimate city-approved plans, causing an increase in the total budget without a corresponding increase in the CLA.  (MOD at 45).  Then, prior to any dispute arising, Reumont "justifiably relied" on the approved budget and D'Errico's representations in accepting a bid that exceeded the budget allotment for the foundation.  (*Id.* at 46).  Although the court explicitly found that D'Errico's provision of the original plans did not amount to fraud, it may have determined that Transact's justifiable reliance on the promise to "be flexible" bound D'Errico to disburse the third draw.

The trial court failed to interpret the agreement to give effect to the intent of the parties that the CLA was a percentage-of-completion agreement.  The trial court made no findings as to the precise contours of the contract with respect to this term, including D'Errico's rights if Transact were to request disbursements that greatly exceeded the progress of construction.  Accordingly, the judgment of the trial court is **REVERSED** and the action is **REMANDED** for consideration of these issues and clarification of its decision that D'Errico's performance was not excused. Again, the trial court may, in its discretion, either make further findings and rulings

1  on the basis of the record developed at trial or may choose to hear receive more
2  evidence.

3                    **4.  Damages**

4        Although this claim is remanded on the issue of liability, the Court will
5  discuss the issue of damages to provide guidance in the event that the trial court
6  again finds that D'Errico breached the CLA.

7        The trial court held that D'Errico's breach caused the total failure of the
8  construction project.  (MOD at 48).  Accordingly, the court awarded as damages the
9  total amount of invoices that Transact paid and that were not otherwise reimbursed
10 by D'Errico.  (*Id.* at 131).  The trial court reviewed the documentation submitted in
11 the third draw and concluded that all submitted invoices had been paid except for
12 two, and the total amount of the paid invoices amounted to $327,029.93.  (*Id.*).

13                 **a.  Damages for a Breach of a Contract to Loan Money**

14       Ordinarily, in a breach of a contract to lend money, the proper measure of
15 damages is the cost of obtaining alternative financing, including the cost to locate
16 and negotiate terms with a substitute lender and any difference in the interest rates.
17 "[T]he basic measure of damages is ***not*** the amount agreed to be loaned . . . ."  25
18 *Williston*, *supra*, § 66:100 (emphasis added).  Additionally, the borrower may obtain
19 judgment for damages for a resulting injury "so far as the defendant had reason to
20 foresee such injury when the contract was made."  11-59 *Corbin on Contracts* §
21 59.3 (rev. ed. 2014) ("*Corbin*").  The Restatement of Contracts summarizes the rule
22 as follows:

23            Because credit is so widely available, a lender often has no reason to
24            foresee at the time the contract is made that the borrower will be unable
25            to make substitute arrangements in the event of breach. . . . In most
26            cases, then, the lender's liability will be limited to the relatively small
27            additional amount that it would ordinarily cost to get a similar loan
28            from another lender.  However, in the less common situation in which

                                   34

1     the lender has reason to foresee that the borrower will be unable to

2     borrow elsewhere or will be delayed in borrowing elsewhere, the lender

3     may be liable for much heavier damages based on the borrower's

4     inability to take advantage of a specific opportunity . . . .

5 *Restatement (Second) of Contracts* § 351, comment e.

6        One circumstance in which a lender will be liable for the borrower's lost

7 profits was found in *Hunt v. United Bank & Trust Co.*, 210 Cal. 108, 116-17, 291 P.

8 184 (1930).  The borrowers in that case transferred everything they owned to the

9 lender as a security for a loan to plant crops on part of their land.  The borrowers

10 could not have acquired the funds elsewhere, because "they were at the end of their

11 financial resources."  *Id.* at 117.  It was thus "clearly within the contemplation of the

12 parties that profits would be derived from the venture which could only be acquired

13 from a fulfillment of defendant's obligation."  *Id.*  The borrowers were thus entitled

14 to recover lost profits.

15        The trial court held that D'Errico's breach proximately caused the failure of

16 the construction project because it was "foreseeable, *ex ante*, that if the D'Errico

17 Living Trust intentionally refused to fund the Third Draw, then that breach would

18 preclude Transact from funding the construction project and would otherwise

19 effectively halt construction of the Custom Home."  (MOD at 130).  The trial court's

20 use of the term *ex ante* here is ambiguous.  It appears that the court determined that

21 it was foreseeable at the time of the third draw request that construction would fail if

22 D'Errico breached his obligation.  The test for liability for these consequential

23 damages is whether it was foreseeable at the time of the *contract*—not at the time of

24 the *breach*—that the lender's breach of his obligation would cause damages flowing

25 from the failure of the borrower's venture.  *Corbin*, *supra*, § 59.3.  A party to a

26 contract cannot be held liable for consequential damages that are not foreseeable at

27 the time the contract is executed.  *Restatement (Second) of Contracts* § 351,

28 comment e.  It would be unfair and inequitable to hold a party liable for damages

1   that were not foreseeable or within the contemplation of the parties at the time the

2   contract is formed, because the party would not have agreed to assume such risks

3   and would not have received consideration to compensate for insuring against the

4   risks.  *See Hadley v. Baxendale*, 156 Eng. Rep. 145, 151 (Ex. 1854).

5         The record is unclear as to whether the parties contemplated at the time of

6   creation of the contract that Transact would be unable to obtain alternative financing

7   if D'Errico breached his obligation to lend the money to fund the construction.  It

8   seems unlikely that D'Errico would have expected that he was the only possible

9   source of funds on July 11, 2006, when the real estate market was booming and real

10   estate financing was available on very liberal terms.  Indeed, D'Errico apparently

11   believed that Reumont was a creditworthy borrower.  And even on October 16,

12   2006, Reumont represented to D'Errico that he "ha[d] other lenders," and he "ha[d]

13   other people that want to lend [him] money."  (ADD0837-38).

14         In order to hold D'Errico liable for the failure to the construction project,

15   D'Errico must have known at the time he entered into the CLA that it would be

16   impossible for Transact to build a home on the property unless D'Errico loaned the

17   money.  While that proposition seems improbable to this Court, the Court cannot

18   decide the question in the first instance, and the trial court must determine it on

19   remand.

20         If the failure of the construction project by D'Errico's breach was not

21   foreseeable at the time of the loan, Transact's damages for the breach are limited to

22   the cost of obtaining alternative financing.  25 *Williston*, *supra*, § 66:100.  In order

23   to recover more than nominal damages under these circumstances, Transact must

24   prove that financing construction through another lender at the same interest rate as

25   the CLA was impossible.  "[T]he borrower may not recover more than the

26   difference between the interest contracted for and that represented by the highest

27   rate of interest allowed by law or the generally prevailing rate."  *Id.*  Use of the

28   prevailing rate is appropriate even if the borrower is unable to obtain an alternative

loan on any terms at the time of the breach.  *See Pipkin v. Thomas & Hill, Inc.*, 298 N.C. 278, 286-87, 258 S.E.2d 778 (1979) (holding that, where consequential damages are not foreseeable for breach of a construction loan, damages for breach of contract to lend money should be based on the difference between the contract rate and the "lowest prevailing rate," along with provable reliance damages).

If, in fact, the inability to obtain alternate financing was foreseeable at the time of the contract, Transact is entitled to consequential damages flowing from the breach.  As the trial court held, however, and no party has properly appealed, lost profits are unavailable because they are too speculative.  Nevertheless, Transact can recover the difference between the amount it spent in reliance on D'Errico's promise to fund construction and the value of the benefit conferred on it as a result of its monetary outlays.  *See Restatement (Second) of Contracts* § 349 illus. 4 (1981) ("*A* contracts to sell his retail store to *B*. After *B* has spent $100,000 for inventory, *A* repudiates the contract and *B* sells the inventory for $60,000 . . . *B* can recover as damages the $40,000 loss that he sustained on the sale of the inventory"); *Pfaff v. Fair-Hipsley, Inc.*, 232 Cal. App. 2d 274, 281, 42 Cal. Rptr. 624, 628 (1965) (remanding to lower court for recalculation of damages resulting from breach of a contract for logging services, because the trial court had not reduced the damages by the value to plaintiffs of being able to use the defendant's logging equipment on other jobs).  These reliance damages are recoverable only if the failure of the construction project was foreseeable, because they flow only from the total failure of the construction project, and could have been avoided if the construction project was able to continue notwithstanding the breach.

### b.  The Trial Court's Damages Award

The basis for the trial court's damages award is not entirely clear.  The trial court determined that Transact was entitled to "compensatory damages" equal to the amount of invoices that Transact could prove it paid and was not otherwise reimbursed, plus a 15 percent "fee" that D'Errico agreed to lend under the CLA.  To

37

1 the extent the trial court intended to award as damages the amount due to be paid

2 under the loan, the trial court erred.  In an action for breach of a contract to lend

3 money, "the basic measure of damages is not the amount agreed to be loaned."  25

4 *Williston*, *supra*, § 66:100.

5      As discussed above, unless the failure of the construction project was within

6 the contemplation of the parties at the time of contracting, damages must be limited

7 to the cost of obtaining alternate financing, whether or not such financing was

8 ultimately available.  But if the failure of the project was foreseeable, Transact

9 would be entitled to consequential damages as well as reliance damages equal to the

10 difference between the amount in spent in reliance on D'Errico's promise and the

11 value of the benefit conferred.  The trial court's award accounts for the Transact's

12 reliance expenditures, but does not consider whether any value was conferred on

13 Transact.

14          **c.  Reliance Damages**

15      If the failure of the construction project was foreseeable, as discussed above,

16 the invoices submitted with the third draw may represent a component of the

17 reliance damages Transact may recover.  There are, however, a number of issues

18 with the trial court's disposition regarding payment of the invoices submitted with

19 the third draw.

20      Appellants argue that the trial court incorrectly found that all invoices in the

21 third draw request had been paid except for two invoices to Harry T. Williams

22 Lumber.  The trial court held that Transact did not prove that these invoices were

23 paid because the invoices were not signed.  (MOD at 131).  The trial court found

24 that the "extant evidence contained in the Third Draw otherwise reflects invoices for

25 amounts paid by Transact for construction costs."  (*Id.*).  The basis for this finding is

26 unclear and puzzling given that many of the invoices in the third draw request are

27 unsigned, like the two invoices that the trial court held were not paid.  (ADD 0699-

28 779).

38

Furthermore, the transcript of the recorded meeting between D'Errico, Hall, and Bakehorn on October 31, 2006, indicates that Transact was seeking D'Errico's help to pay invoices that were not being paid.  (ADD 1015 ("The fact of the matter is, the bills are out there.  [Reumont] is not paying them.  We are coming to you.").  Bakehorn indicated that construction had already stopped at that time, further indicating that bills were not being paid.  (ADD 1026 ("Well, nothing is going to happen now, because I've shut down the job and won't go any further, and you'll never get another concrete guy to come in there . . . [because] you have no money in your budget . . . .")).  On remand, the trial court should clarify the evidentiary basis for its finding that the invoices submitted with the third draw request represent reliance damages.

The trial court further awarded, without significant discussion, the 15 percent contractor's fee due under the CLA.  The so-called "fee" was, in reality, a component of the loan due to be repaid like the rest of the loan.  Under any defensible damages theory, the invoices are compensable only as reliance damages.  It is improper to award this 15 percent "overhead and profit" fee as reliance damages, unless it represents some amount actually paid out by Transact in reliance on D'Errico's promise.  This 15 percent fee may have been reliance damages to the extent that Transact in fact paid the money to Reumont in exchange for his services as contractor.  But the trial court did not sufficiently show that the $58,194.56 (15 percent of $446,158.31) awarded as contractor fees represents damages Transact suffered in reliance on the promise to lend the money.

### d. Benefit Conferred

Transact's reliance damages are measured by the difference between amounts it spent in reliance on the promise to lend money and the value of the benefit conferred in exchange for these outlays.  *See Restatement (Second) of Contracts*, *supra*, § 349 illus. 4.  The trial court did not consider whether any benefit was

1  conferred on Transact in exchange for the amounts it spent in reliance on D'Errico's

2  promise to fund construction.

3       It may be that no benefit was conferred on Transact, because the value of the

4  work that had been done did not increase the value of the property.  Indeed, if the

5  money funneled into the construction project was a total loss, the loss should be

6  allocated to the breaching party.

7       It also may be that Transact received the full value of its monetary outlays: a

8  partially completed building that could have been completed with alternate

9  financing or sold to another developer.  Although the partially completed structure

10  may be valueless ***now***, following the sale of the property by the bankruptcy trustee,

11  the damages must be measured at the time of the breach. This Court cannot and need

12  not answer these questions in the first instance.

13            **5.  Conclusion**

14       Accordingly, the judgment of the trial court is **REVERSED** and

15  **REMANDED** on this claim.  The following questions remain to be determined on

16  remand:

17       Was D'Errico's performance excused because the disbursement request was

18  seriously disproportionate to the progress of construction?

19       Was it foreseeable to the parties on July 11, 2006, that Transact's purpose to

20  construct a home would be impossible if D'Errico did not provide the funding?

21       If it was not foreseeable that Transact's purpose would be impossible, can

22  Transact prove that it could only have obtained alternative financing at a rate higher

23  than 9%?

24       If it was foreseeable that Transact's purpose would be impossible, how much

25  has Transact proven that it actually spent in reliance on D'Errico's promise to fund

26  the construction, and what was the value of the benefit conferred on Transact?

27       In making these factual findings, the trial court may, in its discretion, either

28  use the existing record developed at trial or receive additional evidence.

1          **D. Breach of the Purchase and Loan Agreement by Transact and**

2              **Reumont**

3              **1.  Excuse from Performance**

4          The trial court held that Transact and Reumont were excused from

5  performance under the PSA because RHFD materially breached the PSA, excusing

6  the performance of Transact and Reumont.  (MOD at 112).  As discussed above, this

7  holding is reversed for clear error, both because the breach was not material and

8  because Transact elected to treat the contract as remaining in force following the

9  breach.

10             **2.  Equitable Estoppel**

11         The trial court held that, as an alternative basis to rule in favor of Transact

12 and Reumont on the counter-claim and cross-claim for breach of the PSA, RHFD is

13 equitably estopped from raising a breach of contract claim under the PSA because of

14 "the extenuating circumstances of this case."  (MOD at 112).

15         It is not clear whether equitable estoppel is reviewed de novo or for abuse of

16 discretion.  The application of equitable defenses is generally within the discretion

17 of the trial court.  *See O'Donnell v. Vencor, Inc.*, 466 F.3d 1104, 1109 (9th Cir.

18 2006).  California courts, however, have reviewed equitable estoppel decisions de

19 novo when the question is whether the undisputed facts constitute a sufficient legal

20 basis for equitable estoppel.  *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 226

21 n.9, 92 Cal. Rptr. 534 (2009) (reviewing de novo and affirming the lower court's

22 denial of defendants' equitable-estoppel-based motion to compel arbitration,

23 because the undisputed facts showed that plaintiff's claims did not depend on the

24 agreement containing the arbitration provision).

25         A federal court sitting in diversity applies the substantive law of the forum

26 state.  *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188

27 (1938).  The trial court based its decision in the California law of equitable estoppel.

28 California law governs the breach of contract claims at issue here.  Whether the

41

claim is subject to the defense of equitable estoppel should be governed by California law as well.  Accordingly, the question whether the facts here constitute a sufficient legal basis for equitable estoppel is reviewed de novo.  Even under an abuse of discretion standard, however, the application of equitable estoppel must be reversed, both because the facts here cannot establish an estoppel defense, and because the result is manifestly inequitable.

"Broadly speaking, 'estoppel' refers less to a doctrine than to a conceptual pattern, first articulated in the courts of equity, which has come to pervade our law. When it is successfully invoked, the court in effect closes its ears to a point—a fact, argument, claim, or defense—on the ground that to permit its assertion would be intolerably unfair."  *City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 487-88, 81 Cal. Rptr. 3d 72 (2008) (holding that equitable estoppel was applicable in preventing an insurer from asserting a contract provision requiring a certain performance by insured by a certain time, because the insurer had itself caused the delays by its unfair conduct).  The elements of equitable estoppel are:

> (1) The party to be estopped has engaged in blameworthy or inequitable conduct; (2) that conduct caused or induced the other party to suffer some disadvantage; and (3) equitable considerations warrant the conclusion that the first party should not be permitted to exploit the disadvantage he has thus inflicted upon the second party.

*Id.* at 487-88.

The trial court held that because D'Errico instructed Hall to withhold the city-approved plans from Reumont until two weeks after Transact had committed itself to the PSA and related loans, RHFD was estopped from bringing a breach of contract claim based on the PSA.  Although withholding the city-approved plans did not rise to the level of fraud, the trial court reasoned, this withholding nonetheless required application of equitable estoppel to the breach of contract claim.  (MOD at 113).

In order for equitable estoppel to estop the breach of contract claim, RHFD must have caused or induced the "disadvantage"—*i.e.*, Transact's alleged breach of the contract—such that it would be inequitable to allow Appellants to bring a claim for breach of the contract. *See, e.g.*, *Hoopes v. Dolan*, 168 Cal. App. 4th 146, 162, 85 Cal. Rptr. 3d 337 (2008) (applying equitable estoppel to a breach of contract claim when the plaintiff had induced the defendant to rely on a shared parking agreement, then sued for exclusive parking rights based on agreements he had failed to disclose).

Transact's purported breach was a failure to make required payments under the PSA. There is no evidence in the record that RHFD instructed Transact that payments were not required, or otherwise induced Transact to fail to make the payments. There is no evidence that RHFD improperly induced Transact to enter into the PSA. Indeed, the trial court failed to identify any specific disadvantage that RHFD caused Transact to suffer. The trial court discussed only "D'Errico and Hall's refusal to provide the City-Approved Plans coupled with Hall's providing Transact with the Original Plans (which significantly undervalued the costs of construction)." (MOD at 113). It is not clear how these acts, even if wrongful, could be said to have *caused* or *induced* Transact's breach. Appellants never led Transact to believe that Appellants' failure to obtain city-approved plans that were substantively identical to the original plans would excuse Transact's obligation to pay under the PSA.

Furthermore, taken to its logical conclusion, the application of equitable estoppel here would allow Transact to escape all liability under the PSA at any time while retaining all benefits under the PSA. It is well settled that "one who seeks equity must do equity." *Dickson, Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 445, 99 Cal. Rptr. 2d 678 (2000). Transact's actions in treating the PSA as valid, continuing to render performance under it, and retaining the benefits it received show unequivocally its intent to ratify the agreement notwithstanding the

late delivery of the city-approved plans that differed from the originally provided plans.

Equitable considerations do not favor application of estoppel because it would be manifestly unjust to allow Transact to retain the property without being responsible for paying for it.  Even if RHFD had induced Transact into the PSA by fraud (and the trial court explicitly held that RHFD's acts "did not rise to the level of fraud" (MOD at 113)), Transact would not have been entitled to retain all consideration it received under the contract without responsibility to pay for it.  A party seeking to invalidate a contract based on the counterparty's fraud "may either elect through contract remedy restitution based upon rescission and damages . . . or both restitution and consequential damages."  *Arthur L. Sachs, Inc. v. City of Oceanside*, 151 Cal. App. 3d 315, 322, 198 Cal. Rptr. 483 (1984) (holding that plaintiff could seek contract-based remedies of restitution and rescission because defendant had fraudulently appraised plaintiff's land for less than it was worth). Whether the party seeks rescission or restitution, in either case the party must return all benefit it received under the contract.  Certainly Transact cannot receive a greater remedy for acts that "did not rise to the level of fraud" than it would have received for fraud.

Accordingly, the Judgment is **REVERSED** and **REMANDED** on this claim. On remand, the trial court must determine in the first instance whether Transact and Reumont breached the PSA, and if so, the amount of damages arising therefrom. The trial court may, in its discretion, either use the existing record developed at trial or receive additional evidence.

### E.  Transact's Breach of the Construction Loan Agreement

The trial court held that Transact and Reumont were not liable for breach of the CLA because D'Errico's material breach of the agreement relieved Transact from its obligations thereunder.  (MOD at 115).

1    Appellants argue that Transact materially breached the CLA by failing to

2   maintain good standing in California and Nevada, by failing to provide proper

3   documentation to substantiate its draw requests, and by failing to pay back the

4   amounts disbursed under the CLA.  As discussed above, the action is remanded for

5   consideration of whether D'Errico's performance was excused because the

6   disbursement request substantially exceeded the progress of construction.  Because

7   the basis for the trial court's decision on this claim has been reversed, its decision on

8   this claim is **REVERSED** and **REMANDED** as well.  On remand, the trial court

9   should determine, based on the analysis above, whether Transact materially

10   breached the CLA, excusing D'Errico's performance.  If so, the trial court must

11   determine the appropriate amount of damages arising from Transact's breach.  The

12   trial court may, in its discretion, either use the existing record developed at trial or

13   receive additional evidence.

14    **F.  Intentional or Negligent Misrepresentation**

15    The trial court held in favor of Appellees on the cross-claims for intentional

16   and negligent misrepresentation.  The trial court found that Appellants did not prove

17   that Reumont falsified or otherwise fraudulently submitted invoices.  (MOD at 116).

18   Appellants contend that this finding is clearly erroneous because Appellants

19   presented undisputed and uncontroverted evidence of fraudulent invoices, and the

20   trial court did not mention this evidence in its finding.  Appellants point to the

21   testimony of Debora Medeiros, Reumont's assistant, and Alex von der Launitz, the

22   president of South Cali Concrete, one of Appellees' subcontractors.  Both Medeiros

23   and von der Launitz testified to their personal knowledge that Reumont falsified

24   invoices.

25    As discussed above, the trial court's finding was not clearly in error because

26   there is evidence in the record on which the court could have concluded that the

27   invoices were not fraudulent: the invoices themselves and Reumont's statements

28

1  that they were valid.  The trial court could have determined that the testimony of

2  Medeiros and von der Launitz was not credible.

3  　　　　　Accordingly, the judgment of the trial court is **AFFIRMED** on these claims.

4  　　**G. <u>False Promise</u>**

5  　　　　　Finally, Appellants argue that the trial court clearly erred in finding that

6  Reumont did not falsely represent that he intended to perform on his promise to debt

7  service the loans made by D'Errico and RHFD.  The trial court held that D'Errico

8  failed to prove that at the time Reumont represented that he had ample funds

9  available to cover the debt owed to D'Errico and RHFD and promised to debt

10  service the loan, he did not intend to deceive D'Errico.  (MOD at 118-19).

11  　　　　　This ruling was not clear error because it is supported by evidence in the

12  record.  A determination of fraudulent intent is usually based on circumstantial

13  evidence that must be weighed by the trier of fact.  The circumstantial evidence that

14  Appellants argue incontrovertibly show Reumont's fraudulent intent consists solely

15  of Reumont's testimony that he was "all in" and "overextended on this deal," and

16  that he "didn't really have deep pockets."  (Appellants' Opening Brief at 46 (citing

17  ADD0141:18-0146:17; ADD0159:15-16; ADD0162:4-25)).  The trial court, as trier

18  of fact, was in the best position to weigh the credibility of this testimony to

19  determine whether it indicates that Reumont intended to defraud Appellants when

20  he promised to pay back the money owed on the PSA and CLA.  The trial court's

21  finding was not clear error, and thus the judgment on this claim is **AFFIRMED**.

22  　　**H. <u>Reumont's Standing to Appeal</u>**

23  　　　　　Reumont brings an appeal of the trial court's judgment on four bases: he

24  claims that the trial court erred in (a) failing to hold that D'Errico, Hall, and the

25  D'Errico Living Trust are alter egos or agents with respect to Transact's breach of

26  contract claims; (b) holding that Transact was not entitled to an award of lost profits

27  on its breach of contract claims; (c) holding that D'Errico was not liable for punitive

28  damages for breach of the implied covenant of good faith and fair dealing on

Transact's breach of contract claims; and (d) denying Reumont attorneys' fees under section 1717 of the California Civil Code, because Reumont was successful on all contract claims.

Reumont's first three bases for appeal seek to overturn decisions rendered against Transact. "Only a properly named party may initiate an appeal." *Citibank Int'l v. Collier-Traino, Inc.*, 809 F.2d 1438, 1441 (9th Cir. 1987). Reumont has no standing to bring an appeal on behalf of Transact. Because Transact filed bankruptcy, it is no longer the real party in interest in its claims, and only the bankruptcy trustee has standing to pursue an appeal of a judgment rendered against the debtor. *See Turner v. Cook*, 362 F.3d 1219, 1226 (9th Cir. 2004) (citing 11 U.S.C. § 541(a)(1)). The right to appeal is part of a debtor's bankruptcy estate, and only the bankruptcy trustee can pursue the appeal unless the trustee has abandoned the appeal. *See Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 232 (3d Cir. 2001) (holding that trustee who had moved for substitution in appeal had not abandoned appeal). Reumont does not attempt to argue that the trustee has abandoned this appeal.

Reumont seems to argue that he has standing to pursue this appeal because "[i]n essence, Reumont was Transact." (Reumont's Opening Brief at 4). Whether or not Reumont was Transact's alter ego is irrelevant here, because neither Reumont nor Transact has standing to pursue claims on behalf of Transact.

Accordingly, Reumont's appeal is **DISMISSED** with respect to the first three claims.

### I.  Reumont's Claim for Attorneys' Fees

Reumont argues that the trial court erred in failing to award him attorneys' fees under section 1717 of the California Civil Code, because Reumont was successful on all contract-based claims. While Reumont did not bring contract claims against Appellants, he successfully defended against two contract claims brought by Appellants against him.

"If an action asserts both contract and tort or other noncontract claims, section 1717 applies only to attorney fees incurred to litigate the contract claims." *Santisas v. Goodin*, 17 Cal. 4th 599, 615, 71 Cal. Rptr. 2d 830 (1998) (citing *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 129-30, 158 Cal. Rptr. 1 (1979)).

The trial court held that Reumont did not achieve a "simple, unqualified win" on the contract claims because he only succeeded in defending against two contract claims, he failed to plead contract claims against Appellants, and he failed in his tort claims against Appellants that were related to their contractual relationship. (CAER0162-28 to 29).

As discussed above, the judgment in favor of Reumont on Appellants' breach of contract counterclaims is reversed and remanded. Reumont's claim that he was the prevailing party in the contract claims is not yet ripe, because there is no valid judgment in his favor that could render him the prevailing party. Accordingly, the appeal is **DISMISSED** on this claim. This dismissal does not prejudice Reumont's right to appeal the denial of attorneys' fees if the trial court again rules in Reumont's favor on Appellants' breach of contract counterclaims.

## III.   CONCLUSION

The Judgment is **AFFIRMED IN PART**, **REVERSED IN PART**, and **REMANDED** for further proceedings consistent with the this opinion. Reumont's cross-appeal is **DISMISSED**.

IT IS SO ORDERED.

DATED:  August 6, 2014.

_____
MICHAEL W. FITZGERALD
United States District Judge

48